# 24-2784(L), 24-2977 (Con)

## United States Court of Appeals
## for the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

Marco Ruiz Ochoa, AKA Sealed Defendant 2, Moses Valdez, AKA Sealed Defendant 3, Juan Arellano, AKA Sealed Defendant 4, David Brend, AKA Sealed Defendant 5,

*Defendants,*

David Carmona, AKA Sealed Defendant 1, Gustavo Rodriguez, AKA Sealed Defendant 6,

*Defendants-Appellants.*

*On Appeal from the United States District Court
for the Southern District of New York*

## Opening Brief
### for Defendant-Appellant David Carmona

RICHARD D. WILLSTATTER
*Attorney for David Carmona*
Green & Willstatter
200 Mamaroneck Avenue, Suite 605
White Plains, New York 10601
(914) 948-5656

# Table of Contents

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issue Presented for Review . . . . . . . . . . . . . . . . . . . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

The Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

The Guilty Plea. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The Pre-Sentence Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      a. The Offense Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      b. The Guidelines Calculation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

The Sentencing Memoranda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

The Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

The Forfeiture and Restitution Determinations . . . . . . . . . . . . . . . . . . 26

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ARGUMENT

Point One

      The Loss Calculation of More than $25 Million
      Was Unsupported and Clearly Erroneous . . . . . . . . . . . . . . . . . . 29

      a. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      b. The Claim that $58 Million was Received
         by the End of 2019. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

c. The Claim that $21 Million was Received
in March 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

d. The Claim that Brend received $4.9 Million . . . . . . . . . . . . . . 39

e. The Forfeiture and Restitution Calculations . . . . . . . . . . . . . 40

f. The Error Was Not Harmless . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## Table of Authorities

<u>Cases</u>

*Honeycutt v. United States*, 581 U.S. 443 (2017). . . . . . . . . . . . . . . . . . 26

*Molina- Martinez v. United States*, 136 S. Ct. 1338,
194 L. Ed. 2d 444 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-44

*Rosales-Mireles v. United States*, 585 U.S. 129 (2018) . . . . . . . . . . 43-44

*United States v. Banks*, 55 F.4th 246 (3d Cir. 2022). . . . . . . . . . . . . . . 13

*United States v. Boyd*, 222 F.3d 47 (2d Cir. 2000) . . . . . . . . . . . . . . . . 41

*United States v. Brogdon*, No. 21-475-cr, 2022 U.S. App.
LEXIS 3078 (2d Cir. Feb. 3, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Cavera*, 550 F.3d 1800 (2d Cir. 2008) . . . . . . . . . . 29, 43

*United States v. Chappelle*, 41 F.4th 102 (2d Cir. 2022). . . . . . . . . . . . 29

*United States v. Flores*, 945 F.3d 687 (2d Cir. 2019). . . . . . . . . . . . . . . 30

*United States v. Gamez*, 577 F.3d 394 (2d Cir. 2009) . . . . . . . . . . . . . . 30

*United States v. Jiau*, 624 Fed. Appx. 771 (2d Cir. 2015). . . . . . . . . . . 26

*United States v. Joyner*, No. 20-3305-cr, 2022 U.S. App.
LEXIS 545 (2d Cir. Jan. 7, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024). . . . . . . . . 13, 30

*United States v. Seabrook*, 968 F.3d 224 (2d Cir. 2020) . . . . . . . . . 43, 45

*United States v. Skys*, 637 F.3d 146 (2d Cir. 2011) . . . . . . . . . . . . . . . 30

Statutes

18 U.S.C. § 1349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

 28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

United States Sentencing Guidelines

U.S.S.G. § §2B1.1(b)(1)(L) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2B1.1(b)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S.S.G. § 3E1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## Jurisdictional Statement

This appeal is from a judgment of the United States District Court, Southern District of New York (Rochon, J.), entered October 4, 2024, convicting David Carmona, upon his plea of guilty, to the sole count of an indictment charging him with participating in a wire fraud conspiracy in violation of 18 U.S.C. § 1349. Carmona was sentenced to serve a term of 121 months' imprisonment to be followed by three years of supervised release. Notice of appeal was filed on October 17, 2024.

On January 28, 2025, the court issued a final order of forfeiture and money judgment in the amount of $3,605,297.09. That day, the court also issued an order of restitution in the amount of $789,218.94.

Jurisdiction in the District Court was pursuant to 28 U.S.C. § 1291. Jurisdiction in this Court is pursuant to 18 U.S.C. § 3231.

## Statement of the Issue Presented for Review

Whether the sentencing court erred in finding, over objection, that a 22-level guideline level increase could apply based on a speculative theory of intended loss?

## Introduction

David Carmona and five other men were charged with participating in a wire fraud alleged to have been committed between May 2018 through the end of 2019. The indictment alleged that the defendants advertised a crypto currency business and solicited investors with promises of guaranteed large returns. They allegedly claimed to be buying machines to produce bitcoin or similar crypto currencies, but no such equipment was in fact purchased.

Mr. Carmona pleaded guilty and admitted his guilt, but disputed the government's unsupported claims of $56 million in intended loss. The government's evidence in support of this enormous figure was not based on any reliable facts. Carmona's counsel timely objected to the PSR's recommended 22-level sentencing enhancement and pressed the objection at the sentencing. But the sentencing court erroneously rejected Carmona's argument, finding $56 million in actual loss and that the guideline range was 188 to 235 months. The district court ultimately imposed a sentence of 121 months' imprisonment.

The Indictment

On October 13, 2022, David Carmona and others were charged

with conspiracy to engage in "the IcomTech Scheme" that was alleged to be a purported crypto currency mining and trading company that sold investment products including crypto currency and leases on crypto currency mining machines used to create crypto currency.

David Carmona was alleged to have been the founder of IcomTech. Marco Ruiz Ochoa ("Ochoa"), Moses Valdez ("Valdez"), Juan Arellano ("Arellano"), and David Brend ("Brend") were alleged to have been IcomTech "promoters." The defendants allegedly promised, among other things, guaranteed daily returns on investments and that the value of investments would double within six months. It was claimed that the investors' funds were actually used to pay other investors, to advertise the scheme to others, and for the personal expenses of the defendants. A-57-58.[1]

According to the indictment, Carmona and Ochoa advertised IcomTech to potential investors and recruited Valdez, Arellano, and Brend to help them. The defendants represented that the investments would be used for crypto currency mining and trading, principally of

---

[1]     Parenthetical references preceded by "A" refer to the Appendix; those with "Dkt." refer to documents filed in the District Court on ECF; those with "Tr." are references to the transcript of the Brend/Rodriguez trial.

3

Bitcoin. Carmona allegedly hired Gustavo Rodriguez ("Rodriguez") to build IcomTech's website and online portal on which investors held personal accounts. A-59.

The indictment alleged that Carmona and others attended in-person and virtual promotional events for IcomTech at which they encouraged attendees to invest as a means of achieving financial freedom and boasted about the amount of money they were earning through IcomTech. A-60. Investors were provided individual online accounts. It was claimed that "there were no real gains because there were no true investments. . . because IcomTech engaged in no cryptocurrency trading or cryptocurrency mining." The conspirators allegedly "used Victims' money to make payouts to other Victims, enrich themselves, and to finance further recruitment of Victims[.]" A-61. The defendants allegedly withdrew "tens of thousands of dollars collected from Victims" and spent those funds. A-62.

It was alleged that the defendants entered into a contract on behalf of IcomTech to purchase cryptocurrency mining equipment but they did not pay the supplier or receive any equipment. Yet, Carmona and Ochoa allegedly continued to promote IcomTech's purported

investment with the Mining Equipment Supplier to investors. A-62.

The defendants initially purported to sell Bitcoin but later sold what the claimed was their own cryptocurrency, "Icoms" that were offered for sale at a few cents each, but later sold for only as much as a penny or less. A-64. The scheme ended near the end of 2019 when IcomTech ceased making payments, and the defendants stopped promoting its purported products. A-66.

The Guilty Plea

On December 22, 2023, Mr. Carmona pleaded guilty before Judge Rochon to the sole count of the indictment, wire fraud conspiracy in violation of 18 U.S.C. § 1349. He admitted that he and the other leaders of IcomTech kept their investors' money. A-88-89. Mr. Carmona explained he took money in cash and by wire transfer. He did not invest the money in the way that he represented he was going to invest it. He used the money to pay for events and promotions, but he and the others kept the rest. He told the investors that he was going to use their money to buy crypto mining machines, but he did not do that. He knew this was wrong and illegal. A-89-91.

Mr. Carmona understood that the government had produced a

"Pimentel letter" setting forth their guidelines calculation and asserted that the applicable sentencing range would be 151 to 188 months or that it might be 188 to 235 if it developed that there were more then 25 victims who suffered substantial financial harm as defined in U.S.S.G. § 2B1.1(b)(2)(C). A-86-87. A copy of the letter was marked as Court Exhibit 1. A-86.

Judge Rochon accepted the guilty plea. A-97.

The Pre-Sentence Report

The PSR showed that Ochoa had pleaded guilty to wire fraud conspiracy and had been sentenced to serve 60 months' imprisonment, to be followed by two years' supervised release. Brend and Rodriguez had been convicted after trial, but had not been sentenced. PSR ¶¶ 5, 8-9. On October 31, 2024, Rodriguez was sentenced to serve 96 months' imprisonment. Dkt. 309. On December 2, 2024, Brend was sentenced to serve 120 months' imprisonment. Dkt. 332.

a. The Offense Conduct

The PSR reported that Mr. Carmona founded IcomTech, that Ochoa was a senior manager and promoter and that Valdez, Arellano and Brend were also promoters who made false promises to their

customers, including guaranteeing daily returns on investments or that the victims would double their investment within six months. IcomTech was a "Ponzi Scheme." PSR ¶¶ 14-17. The defendants "used the funds they solicited from their victims to pay other victims to further promote the scheme to other potential victims and to pay for personal expenditures. Although some victims received small payouts from IcomTech, most of the victims lost their entire investments." PSR ¶ 17. IcomTech did not really engage in cryptocurrency trading or cryptocurrency mining. PSR ¶ 25.

David Carmona hired Rodriguez to build IcomTech's website and online portal. Rodriguez advised Mr. Carmona how to structure IcomTech's compensation plan and investment products, on setting the purported daily returns on victims' investment packages and on the size of the investment packages that he should offer for sale. PSR ¶ 21.

The defendants traveled throughout the United States and internationally to promote IcomTech. They presented its investment products and attendant compensation plan. Some of the investors in IcomTech acted as culpable promoters, but it was unclear how much money those promoters fraudulently made. "The line between promoter

7

and investor/victim was not always a clean one; promoting the scheme was not a guarantee that one would make money." PSR ¶¶ 22-24.

Law enforcement "discovered several deposits and withdrawals involving money obtained from at least 10 victims." In 2018 and 2019, approximately $1,040,000 was deposited into Ochoa's bank account. Of that amount, approximately $280,000 were cash deposits, and approximately $136,000 were "internal transfers" from an unnamed person's personal checking account held at the same bank. A significant portion of the credits to Ochoa's account "appear[ed] to have come from payments from legitimate construction companies" but the PSR stated that the cash deposits and "many of the wire transfers" were "consistent with victim payments made to IcomTech." PSR ¶¶ 26-28.

In September 2018, Carmona and Ochoa entered into a $1.2 million contract on behalf of IcomTech to purchase cryptocurrency mining equipment from a company called Krambu. They touted IcomTech's purported investment to promote IcomTech. IcomTech paid Krambu $60,000, but never received any equipment from them. The government suggested that "it appears that Krambu filed an anonymous complaint against IcomTech, CARMONA, and RUIZ

8

OCHOA with the SEC in February 2019." PSR ¶¶ 29-33. In 2018, Carmona texted Rodriguez that he never intended to purchase cryptocurrency mining equipment and that he entered into the Krambu agreement to make IcomTech appear legitimate. PSR ¶ 34.

In September 2018, Ochoa alerted Carmona that the SEC had contacted him about a complaint against IcomTech. In order to keep the scheme from being detected, Ochoa would often ask Carmona to pay or not pay certain victims. By mid-February 2019, IcomTech had liabilities to investors of at least $3.5 million. PSR ¶¶ 37-38.

During the Summer of 2019, IcomTech's promoters notified the investors that IcomTech would no longer be crediting their accounts with Bitcoin, but with a proprietary cryptocurrency known as "Icoms." The PSR stated, "In reality, Icoms were essentially worthless, peaking at approximately $0.01 on external exchanges and falling to a fraction of a penny thereafter." PSR ¶ 39.

By the end of 2019, IcomTech had ceased making payments to the victims, and its chief promoters, including the defendants, stopped promoting IcomTech and stopped responding to questions and complaints from their victims. Most of the victims who invested in

9

IcomTech lost their entire investments. PSR ¶ 43.

It was claimed that several "IcomTech user accounts" were used by Carmona, Brend and unidentified others to receive investment funds from investors. It was contended that Carmona and Brend were responsible for an intended foreseeable loss of "at least $58,168,631.59." That figure was said to represent the total amount of investments deposited into the IcomTech user accounts. The manner in which that calculation was made was not provided. PSR ¶ 52. The government claimed that "the scheme involved tens of thousands of people" but the probation officer found insufficient proof that at least five victims suffered substantial financial hardship. *Id.*

b. The Guidelines Calculation

The PSR recommended a base offense level of 7 with a 22-level increase based on a loss exceeding $25,000,000 pursuant to U.S.S.G. § §2B1.1(b)(1)(L). PSR ¶¶ 63-64. There was also a recommended two-level increase because the offense included 10 or more victims pursuant to Section 2B1.1(b)(2)(A)(I), a two-level increase pursuant to Section 2B1.1(b)(10) because the offense involved sophisticated means, and a four-level increase for aggravating role in the offense as provided by

10

Section 3B1.1(a). PSR ¶¶ 65-66, 68. The adjusted offense level was said to be 37, but three levels were deducted for acceptance of responsibility, yielding an adjusted offense level of 34. PSR ¶ 74.

Mr. Carmona's criminal history score is zero so his criminal history category was CHC 1. PSR ¶ 78. The corresponding advisory sentencing range was said to be 151 to 188 months. PSR ¶ 115.

The draft PSR stated, based on information from the government, that the intended loss was more than $9,500,000 but not more than $25,000,000 which allegedly represented the investments that were made by at least 10 victims. But the government objected. They claimed that, "According to the evidence that was established at Brend's trial, Carmona and Brend are responsible for a foreseeable loss amount of $58,168,631.59." PSR at 27. The government relied on a spreadsheet it offered at Brend's trial that allegedly showed "balances of IcomTech user accounts totaling $58,168,631.59." According to the government, another spreadsheet, dated October 17, 2019, was made at Brend's direction and it itemized the accounts and funds paid into the scheme for each account. The government wrote that, "these funds were clearly identified in the 'All the users' spreadsheet as IcomTech

balances." PSR at 27-28.

Defense counsel objected, contending the foreseeable loss amount was grossly overstated and unproven. Counsel argued that Carmona's foreseeable loss amount was aligned more closely with co-defendant, Marco Ruiz Ochoa, who was held responsible for a foreseeable loss amount between $550,000 and $1,500,000. *Id* and Dkt. 233. But the probation officer sided with the government.

The Sentencing Memoranda

On September 20, 2024, Carmona filed his sentencing memorandum. He objected to the PSR's recommendation of an "intended foreseeable loss of at least $58,168,631.59," arguing the Government had failed to offer sufficient proof of an intended foreseeable loss of that amount. Dkt. 271 at 2-3. The 58 million dollar figure was based on testimony and exhibits from the trial of co-defendants David Brend and Gustavo Rodriguez. Specifically, the PSR relied upon a spreadsheet purporting to show balances of IcomTech user accounts. PSR ¶ 64; PSR at 27-28 (resolving objections).

Counsel argued that the spreadsheet amounted to uncorroborated hearsay and, while the trial defendants stipulated to its admissibility,

12

it was really not admissible. The spreadsheet was apparently obtained from the email account of an unindicted conspirator who received it from yet another unknown individual. No proof was offered at the co-defendants' trial to show how the calculations on the spreadsheet were reached or the origin of the figures in it. The spreadsheet's contents were unreliable and were not corroborated by any other evidence. Counsel argued that the government failed to establish by a preponderance of the evidence that the spreadsheet is reliable and accurate. No witness was called at trial to assert the truth of the spreadsheet's contents or to establish the source its data. According to PSR ¶ 52, the trial witnesses testified to an actual loss of approximately $125,000, far less than the alleged intended loss amount of $58,168,631.59. Dkt. 271 at 7-11.

Defense counsel argued that, consistent with *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), the sentencing court should apply an 8-point loss enhancement (more than $95,000 but less than $150,000) to Mr. Carmona.[2] Dkt. 271 at 11.

---

[2] But see *United States v. Rainford*, 110 F.4th 455, 475 n.5 (2d Cir. 2024) ("We adhere to *Stinson* and defer to the application note").

For its part, the government argued that the 22-level increase recommended by the PSR should apply. They argued, "Evidence developed as the Government prepared for trial supported a range higher than the range set forth in the *Pimentel* letter. For instance, at the time the *Pimentel* letter was drafted, the Government assessed the GX 225-S image sent from Rodriguez to Carmona showing over $21 million in funds flowing into IcomTech as strong evidence that the loss exceeded $9 million. Through proffers with Juan Arellano, and Arellano's testimony at trial, the evidence grew stronger that the 'All the users' spreadsheet, with over $58 million in balances of IcomTech victims, accurately demonstrated losses exceeding $25 million." Dkt. 275 at 18, n. 7. The prosecutors argued that the spreadsheet, entitled "All the users," was maintained by IcomTech promoter Aline Hernandez, and that it shows 52,000 rows with investor usernames, and a "Balance" column that sums to approximately $58,168,631.59, referring to GX 1303-A-T. They wrote that Arellano testified that this spreadsheet likely undercounts the number of users, and the resulting balances, in part because Hernandez was merely one promoter among

14

many, and he had recruited individuals whose identities were not reflected on the sheet.[3] (GX 1303-A-T; A-106, 124). They claimed David Brend directed a smaller-scale accounting effort (see, e.g., GX 1800-T, A-128), showing a "Total Investment" in Brend's "downline" of approximately $4.9 million. Further, they claimed David Carmona sent an image on March 24, 2019 to Gustavo Rodriguez containing the "Total Earning" of IcomTech to-date: approximately $21 million, from over 15,000 total members. (GX 225-S; A-112). This calculation was made nearly ten months earlier than Hernandez's spreadsheet, and given that the scheme continued far beyond March 2019, $58 million would represent a logical—if not significantly underestimated—expansion of the pyramid scheme. Dkt. 275 at 23-24.

The Sentencing

Defense counsel argued that the loss figure was more than $500,000 and less than $1,500,000 which would result in a 14-level increase, the loss amount the court found attributable to co-defendant Marco Ruiz Ochoa, when he was sentenced in January 2024. A-143-144.

---

[3] The trial transcript shows that Arellano did not give this testimony. He was called by the government and the sentencing court heard his testimony.

The government asserted that there were $4,792,000 in proceeds that were traceable to the offense that the defendant personally obtained. They claimed Carmona controlled three Bank of America accounts that "took in" $1.533 million "during the relevant period." Two of those accounts had been seized and together they held approximately $328,000, but previously held more money. The $1,533,000 was claimed to be the amount that was deposited into those accounts which "appeared to be victim funds." A-145-146.

Separately, the prosecutor claimed "certain investors paid into the scheme using actual cryptocurrency" and that an accountant with Homeland Security Investigations somehow calculated the value of all of those cryptocurrency transactions at the time the transactions occurred which amounted to $3.259 million. A-145-146.

The government acknowledged the price of Bitcoin fluctuated "wildly over time," but claimed the HSI accountant's "methodology" sought to find "the value of that particular cryptocurrency at the time it was transferred" to Carmona. They claimed Carmona received $4.792 million in proceeds of the offense. A-146.

The defense contested the government's calculation. Counsel

16

asserted the government failed to disclose the basis for it, including when the deposits were made. Counsel claimed the accounts were opened before the scheme commenced and that David Carmona has bought and deposited cryptocurrency into them. The government had not disclosed the pre-existing balances in those accounts. The government's submission included numbers derived from unidentified sources. A-147-148.

The government offered to provide more information to "get into the weeds" and although the prosecutor believed amounts that were not proceeds were not included, the government would "confirm that stuff" in a later submission. A-149. The government explained that it included incoming deposits on the "All the Users" spreadsheet that corresponded with "the reported cryptocurrency investment products that IcomTech was offering" made by persons "for instance whose name links up with the spreadsheet...or otherwise has indicia there ... a lot of people with Hispanic last names, for instance, which fit the profile of a typical IcomTech investor, and similarly with the cryptocurrency." A-149.

In response to the court's inquiry whether the time period of

17

investments correspond with the "lifetime of IcomTech," the government was non-committal, "Definitely from 2019, your Honor. I would have to dive into those spreadsheets again to get you all the particulars." The prosecutor was unsure. He claimed Carmona participated in unidentified "schemes both before and after" the IcomTech scheme. He believed he had "excluded those amounts [from his calculation], but offered to "confirm that stuff after the proceeding." A-149.

The court acknowledged that it did not have the basis for an order of forfeiture of a particular amount. The court decided to defer ruling on the forfeiture after receiving "the basis for that" so the Judge ordered, over objection, that forfeiture be awarded and in an amount to be determined after the hearing.  A-149. Defense counsel objected and argued that the government's calculations were derived "from places where the connection to my client is weak." A-150. The court decided to get more information from the government on the issue of forfeiture. A-151.

As to guidelines loss, defense counsel argued that the government's loss calculation was based on a spreadsheet emailed by a

person who was not one of the defendants who received it from an unidentified third party, so it was unreliable. The government had not shown how the data was obtained and could not say whether it was altered or "hacked." Counsel pointed out that the government had initially argued that the total amount in the spreadsheet was $65 million and then said it was $58 million. He pointed out that the spreadsheet appeared to show that Carmona, the alleged leader, received somewhere between $210,000 and $400,000 whereas the person who received the spreadsheet appears to have received more money, approximately $500,000. There were some 58,000 entries, apparently representing that many investors. Counsel argued that number was unrealistically high given the time frame of the alleged conspiracy. It would mean that 4,000 investors were added per month. Even after de-duplicating, the government estimated there were approximately 14,000 investors so that would mean one to two thousand investors would have joined every month which was very unlikely. The notion that the balances in the spreadsheet reflected actual or intended loss was farfetched. The government was "asking the Court to accept it at face value or as gospel that this is the total amount

19

of money that was lost or intended loss. . .It's very difficult to swallow that." A-151-154. The meaning of the spreadsheet itself was difficult to decipher; there was no way to determine what the figures found in it represented. The government's estimate amounted to a guess. The government had seized IcomTech computers, but they were not using that data. A-154-155.

The prosecutors argued that the amounts in the spreadsheet for "all users" totaled $58 million, so that was enough proof. The government admitted that it really did not de-duplicate the spreadsheet because some investors might have had multiple accounts. "To kind of get their binary squared away so they would be at the top, and boop, boop, and go down from there," said the Assistant U.S. Attorney. He said that the de-duplication effort reduced the number of "users" from approximately 58,000 to around 50,000. A-155.

As for corroboration, the government relied on a "communication" between Carmona and Gustavo Rodriguez, who created the IcomTech website, in which Carmona shared a document showing total earnings (as of March 2019) of $21 million, with 15,000 total members. The government claimed that was at the beginning of the scheme, so the

20

total was likely higher. Brend's much smaller $4.9 million estimate, made around the same time frame, somehow corroborated the $21 million estimate, the government argued. A-156. However, the court found that Brend's calculation was made much later, on October 17, 2019. A-164.

The government did not charge Aline Hernandez, the promoter who was said to created the spreadsheet, but that was irrelevant, they said. The government argued that "the math is not crazy" citing, as illustrative support, Mike Myer's character in the movie *Wayne's World*.[4] A-156-157.

The government argued that Ochoa was not tagged with the $58 million loss because he left the scheme at some point in 2019. A-157. The PSR does not say that Ochoa left the scheme early in 2019, but does say he was responsible for a foreseeable loss amount of only between $550,000 and $1,500,000. PSR at 27. The government admitted that it gave Ochoa a favorable deal because he pleaded guilty early, so that it was just that Carmona should be more severely

---

[4] *Wayne's World* (Paramount Pictures 1992) was a comedy produced by Lorne Michaels.

punished because he did not.[5] This was "unfortunate for Mr. Carmona." A-158.

The sentencing court found that "the actual loss from the IcomTech conspiracy was at least $25 million, placing it within the sentencing guidelines range of 25 million but less than 65 million." The court relied on the "Hernandez spreadsheet." A-161. It found that the spreadsheet has 52,000 rows of investor names and a balance column that adds up to approximately $58 million. The spreadsheet is not a perfectly reliable source, the court opined. Some of the items on the spreadsheet appear to overstate the loss to some IcomTech users. Yet, "indicia of reliability" included it's "connection" to two of Hernandez's e-mail accounts, its use of IcomTech's related language, and its inclusion of numerous confirmed victims of the IcomTech scheme. The court thought the spreadsheet understated some investors' losses and might have omitted others altogether. At Ochoa's sentencing, one man claimed a loss of $10,000 and another claimed he lost $17,500, but the

---

[5] The docket entries show that Ochoa pleaded guilty on September 27, 2023. Carmona pleaded guilty on December 22, 2023, less than 90 days later.

spreadsheet shows they had zero balances.[6] The court also asserted that Arellano had testified that the spreadsheet likely undercounted the number of users and balances because he had recruited people who were not reflected on the spread sheet.[7] Accordingly, the sentencing court found the spreadsheet provided "at least some evidence" for it to consider. A-161-163.

The court found that Brend's $4.9 million figure might be multiplied because he was one of several promoters. The court referred to an image, GX 225-S (A-112), sent in March 2019 in which $21 million was listed as "total earning," so the court thought the loss figure might have been higher. A-164. The court speculated that even if there were just 24,000 investors, the loss would might have been more than $25 million. A-165.

The court found that Ochoa's sentencing took place before Brend's trial "when the full evidence regarding loss amount was not yet known" apparently referring to the court's knowledge, not the government's. A-

---

[6] The district court apparently did not consider the possibility that, despite their claims, these persons had not really lost any money.

[7] Again, there was no such testimony. It appears the court adopted the government's incorrect recollection although the court heard the trial testimony.

167. The government was preparing for the March 4, 2024 Brend trial on January 19, 2024 when Ochoa was sentenced. In any event, Arellano's cooperation did not make the Hernandez spreadsheet more reliable as he did not create it, did not know who created it, and could not speak to its accuracy.

The court found its greater than $25 million loss calculation was an estimation of actual, not intended, loss. The court understood that large cash seizures had not been made which might be inconsistent with such a large actual loss, but discounted that because the defendant spent money on a luxury lifestyle, huge promotional events, and speculated that money might have been moved overseas. A-168.

The court found the offense level was 36 so that, with a criminal history category of 1, the guidelines range was 188 to 235 months. A-183.

The government was seeking a forfeiture order of $4.792 million but had not "shared the substantiation with either the Court or with defendant." A-190. The defense did not oppose the forfeiture of two particular bank accounts, but opposed the large money judgment. A-191-192. One account held $221,239.24 while the other had

24

$108,225.00, for a total of $329,464.24. The court ordered the forfeiture of those accounts, but permitted the government to submit the basis for a money judgment after the term of imprisonment was pronounced. A-194.

The government sought a term of imprisonment of 188 months. A-195. The prosecutor intended to seek restitution and forfeiture in "the exact same amount" for each. A-201, 234. The government admitted they had not asked for restitution from Ochoa but promised they would "if the law allows us to." A-201. They never did, despite their obligations under the Mandatory Victims Restitution Act.

A sentence of 121 months' imprisonment was imposed, to be followed by three years of supervised release. The sentencing court suggested that if, hypothetically, the guideline range was lower, it would select the same sentence even if an upward variance would be required. A-227-228.

Restitution was deferred for 90 days. The court ordered the forfeiture of the two Bank of America accounts that contained $221,239.24 and $108,225, respectively. The court announced its intention to enter an additional forfeiture money judgment at a later

25

date. A-231-232.

The initial judgment included the forfeiture of the two bank accounts and the balance of a money judgment and restitution to be determined. A-242-243.

The Forfeiture and Restitution Determinations

After receiving several submissions, the sentencing court entered an order of restitution totaling $789,218.94 and an order of forfeiture of $3,605,297.09, less than the government sought. A-248.

The forfeiture order was imposed, over objection, for proceeds from the entire conspiracy, provided that the actions generating the proceeds were reasonably foreseeable to Carmona. The district court relied upon this Court's summary order in *United States v. Jiau*, 624 Fed. Appx. 771 (2d Cir. 2015) (A-261) which was decided prior to *Honeycutt v. United States*, which held that "a defendant may [not] be held jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." 581 U.S. 443, 445 (2017). In any event, the $3.6 million figure was the amount the government could show was acquired by all of the

26

conspirators. Notably, that amount, if applied as guidelines loss would result in an 18-level increase, not the 22-level increase applied for more than $25 million dollars in loss.

## Summary of the Argument

While the prosecutors sought a guidelines loss amount of between $550,000 and $1,500,000 (a 14-level increase) for a co-conspirator, Ochoa, who then was sentenced to serve 60 months, for Carmona they successfully persuaded the court to find a loss of more than $25 million, subjecting him to a 22-level increase. Carmona pleaded guilty less than 90 days after Ochoa, but received a sentence of 121 months, more than twice as long. Even taking into account the one-level difference in role adjustment, Carmona's sentence was mostly driven by the loss calculation.

But the court's finding of more than $58 million in actual loss was based on an utterly unreliable spreadsheet and purportedly corroborated by a screenshot and by another spreadsheet, neither of which could reliably show how much money was stolen. The government also relied on nearly unintelligible testimony from a cooperator about the meaning of a spreadsheet he did not create, did not receive until witness preparation, and could not explain. Any objective examination of the purported evidence would cause one to be uncomfortable with the sentencing court's decision. It was wrong.

28

ARGUMENT

Point One

**The Loss Calculation of More than $25 Million
Was Unsupported and Clearly Erroneous.**

Carmona was subjected to a 22-level fraud loss increase in offense levels based on an erroneous finding that the actual loss was more than $25,000,000. The district court relied on three sets of facts in support of the finding. First, the court relied on a spreadsheet attached to an email in alleged co-conspirator Aline Hernandez's email account. Second, the court referred to an image Carmona texted to Rodriguez in March 2019. And third, the court relied on a spreadsheet someone emailed to David Brend in October 2019 that showed total investments of $4.9 million in a "Fire Team." These claims did not prove by a preponderance of evidence that the actual loss exceeded $25 million.

**a. Standard of Review**

A district court commits procedural error when it makes a mistake in its Guidelines calculation or rests its sentence on a clearly erroneous finding of fact. *United States v. Chappelle*, 41 F.4th 102, 107 (2d Cir. 2022) citing *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir.

29

2008) (en banc). This Court reviews *de novo* a "district court's interpretation of the Guidelines." *United States v. Gamez*, 577 F.3d 394, 397 (2d Cir. 2009). A sentencing court must make findings that are sufficiently specific to permit meaningful appellate review. *Rainford*, 110 F.4th at 476; *United States v. Flores*, 945 F.3d 687, 721 (2d Cir. 2019). Rulings of law are reviewed *de novo*; findings of fact are reviewed for clear error. *United States v. Skys*, 637 F.3d 146, 152 (2d Cir. 2011).

**b. The Claim that $58 Million was Received by the End of 2019**

The government argued that there was $58 million in intended loss based on the so-called Hernandez spreadsheet that was introduced in evidence at the Brend/Rodriguez trial, GX-1303-A-T, without the government laying any foundation. At the trial, they just asserted that the spreadsheet was attached to an email from Aline Hernandez's account, not that she created it or maintained it. A-102. When Carmona was about to be sentenced, the government asserted that the spreadsheet was maintained "by top IcomTech promoter Aline Hernandez," that it had 52,000 rows of "investor usernames," and a "Balance" column that sums to approximately $58,168,631.59. Dkt. 275

30

at 23.

The government asked the sentencing court to rely on its arguments submitted in connection with Brend's sentencing. Dkt. 275 at 23 referring to Dkt. 245 at 3-7. But in that submission, they conceded the spreadsheet's reliability was questionable.

> To be sure, Aline Hernandez's spreadsheet has limitations. Trial evidence did not include testimony from anyone with direct knowledge of the spreadsheet's creation. The document does not provide citations to receipts for each number in each cell, or otherwise guarantee with complete accuracy and precision the full amount of the money victims lost in the scheme.

Dkt. 245 at 7. A significant footnote followed:

> The IcomTech website also displayed figures for each user's **"balance," which reflected the victims' fictitious earnings**. (*See, e.g.*, Tr. 590 (testimony of Dr. Nektarios Demetriou), Tr. 286–87 (testimony of Moses Valdez, regarding GX 1628).) It is not clear what relationship, if any, Rodriguez's website had to Hernandez's spreadsheet, which, given Brend's chat messages cited above (GX 230), may well be the result of input from victims

31

giving their own accounting and passing the information up the line.

Dkt. 246 at 23, n. 8 (emphasis added). Rodriguez was the creator of IcomTech's website and he maintained running balances of the fictitious calculations of the purported value of the investors' accounts. The "balance" information was a fiction. The government's claim that the $58 million figure fairly represents the guideline loss should be surprising, if not eyebrow raising.

The government attempted to shore up its argument by referring to the trial testimony of cooperator Juan Arellano who gleefully participated in the IcomTech fraud. They argued that Arellano testified that this spreadsheet likely undercounts the number of users, and the resulting balances, in part because Hernandez was merely one promoter among many, and he had recruited individuals whose identities were not reflected on the sheet. Dkt. 275 at 23-24 citing Arellano's testimony at 955, A-105. At the Brend trial, Arellano testified that Hernandez was one of IcomTech's "company masters" but he did not testify that the spreadsheet likely undercounts the number of users. The prosecutors showed him the spreadsheet in preparation

32

for his testimony, but he did not even know who created it. A-103, Tr. 1029 ("I don't know who created it"). He opined that the spreadsheet that "more or less gives a record of accounts, account balance," but upon objection to the lack of foundation, no further foundation was elicited. A-104.

Arellano's testimony concerning the spreadsheet was nearly incomprehensible. Asked how he could make more money by having multiple accounts, Arellano said, "Because it's a way of manipulating the system. For example, it's a binary. I have an account and I have two open positions for that account. I've got one in the left and one in the right. If I myself buy the one on the left and the one on the right, and those accounts which also have one on the left and one on the right, I would then have seven accounts. Now I form four groups and I don't hang them off of the first account, nor from the second one, nor from the third one, I hang them from the fourth and the fifth and the sixth and the seventh. So what happens, I don't get paid for one binary, I get paid for three binaries with the same number of people." A-106. Asked to explain the column titled ItCredit, Arellano said, "When we ask David for balance or points. For example, if I was at a presentation and

33

I had $10,000 in balance or points – in points, and within the group for that presentation we signed up the amount of $50,000. And amongst the leaders who were there, all we had to do was put in another 20,000. We still needed 20,000 points, so I would ask David for them. He would send them to me. And then when I saw him, I would pay him the rest the $20,000 that he had sent to me." A-106-107.

Arellano was asked to explain the meaning of "sales volume" although the spreadsheet has no such column. He testified that sales volume represented the money that people brought in. But then he referred to columns titled "Left" and "Right." Asked if right mean something different than left, Arellano said, "No, because the volume is always going to change. The volume of sales on the right is different to the volume of sales on the left. For example, if you look at where it says Carmona 1, you can see that it says on the left 25,076,164, and on the right it says zero.[8] That does not mean that the right had no volume. It means that the volume that came in on the right-hand side was commissioned completely. So every time you commission or take your commission out, you subtract the volume from what your commission

---

[8]     A-124 at line 1, column headed "Left."

was. It means that in order to get paid on the right-hand side, the left-hand side had over 25 million." A-108. One cannot discern what Arellano meant to say or even whether his testimony was competent.

The "Left" column on the spreadsheet actually sums to $2,314,142,921— more than two billion dollars! Arellano's assertion that the left column represented sales volume (Tr 956-957) cannot be correct. In addition, the Right column sums to $1,061,844,725– more than a billion dollars. Total ItCredit sums to $26,703,422.32 while the ICOM column sums to a staggering ten quadrillion dollars: $10,010,045,000,000,000. None of these numbers can be described as anything but fictitious or even nonsense. In fact, no witness testified about the meaning of the spreadsheet's "Balance" column. Arellano did not create the spreadsheet, did not know who created it and could not say it was accurate. But he did understand that he and his co-conspirators falsely represented to the victims that their investments had grown exponentially when he and his colleagues pilfered their money. The conspirators may have kept a tally of their false representations of the value of the victims' investments, but one cannot even tell if the spreadsheet accurately reflects that.

35

### c. The Claim that $21 Million was Received in March 2019

The government urged, and the sentencing court found that, as of March 24, 2019, IcomTech had defrauded investors of approximately $21 million. A-164. The government based this claim on text messages between Rodriguez and Carmona, GX-225-T, which are 1,750 pages in length. The court found, "on March 24, 2019, Mr. Carmona sent an image to Mr. Rodriguez, another codefendant, containing the quote 'total earnings' of IcomTech to date: Approximately 21 million, from over 15,000 total members. That's at GX 225-S. Rodriguez notes in [a] text with Carmona, that the $21 million figure 'represented the actual numbers.' GX 225-T at 1377." A-164 referring to A-119. This finding was clearly wrong.

The messages show that, on September 15, 2018, Carmona instructed Rodriguez that "We decided that they shouldn't be able... to pay with earnings...And everyone is paying with their earnings...fix it for me quick....You're going to bankrupt me…like that." Rodriguez responded, "David, that's how you ordered it and that's how it is; you can pay with full package earnings. You can't transfer/spend credit. That's what you asked for." But Carmona wrote, 'No." A-113-116.

36

On March 24, 2019, Rodriguez texted Carmona, "cashout paid $2771899.94". Carmona then asked, "What's that?" to which Rodriguez wrote, "Those are the cashouts that have been marked as paid...the total amount." After Carmona sends an image, GX-225-S, Rodriguez wrote, "Yes...we just uploaded that...Those are the actual numbers." Carmona wrote, "Which ones?" and Rodriguez responded, "All of them." GX-225-T, A-117-119a. The image, GX 225-S, showed:

**Total Member**

15601

**Total Earning**

$21037424

**Pending Cashout**

$237361.29999999973

**Cashed Out**

$2771899.9499999974

**Current Earning**

$5851243.5000009165

A-112.

On April 10, 2019, Rodriguez wrote, "They're now working on the token thing in order to be able to pay with earnings." A-120.

On May 30, 2019, Carmona wrote, "Check the system because

37

it allows ...to buy...without having earnings or IT credit...check that nobody can hack the system...champ...Set that up so that they have to pay with earnings...For the cashouts......not to make up too many." The next day, Rodriguez responds, "The buy with earnings feature is now ready." A-121-123.

The government argued that the conspirators lied to the victims about their "earnings" from the scheme. The "total earning" screenshot might have shown what the total false representations were, that is, what the total false amount the investors were told their accounts were worth–when they were in fact worthless. According to the texts, Carmona was concerned about the "cashouts" which represented the amount, $237,361, the victims had withdrawn from their accounts because those withdrawals, he said, might "bankrupt" him. He was Focused on limiting the victims' use of fictitious "earnings" to buy more shares and their withdrawal of money from IcomTech. No witness testified that "total earning" reflected how much the conspirators had stolen. At that point, the available evidence showed the scheme was just getting started. The court's finding that the loss, as of March 2019, was $21 million was clearly erroneous.

### d. The Claim that Brend received $4.9 Million

The court relied, in part, on the government's representation that a spreadsheet ("the Master Team spreadsheet") attached to an email sent from an email address for Lorraine Jones to David Brend accurately reflected the total he and his "team" stole. The email, dated October 17, 2019, was sent near the end of the operation of IcomTech with the subject line "MASTER Fire Team lcomtech Payout Worksheet FINAL 2019-10-17 submittal.pdf." A-127.

The Master Team spreadsheet was admitted at the Brend/Rodriguez trial by stipulation. Brend Tr. 1063. No trial witness authenticated or explained its contents. No one explained who created it or the meaning of the "totals" in it. The first page has a "Grand Totals" line and a "Total Investments" line with $4,906,464.36 but also a "Current Balance" line with $2,093,410.99 and a "Total Earnings" line of $2,201,125.73. A-128. The PSR and the government alleged that the conspirators stole all the money they received, so it does not make sense that they would retain a $2 million balance. And it was undisputed that the money received by IcomTech did not earn a dime, so the Total Earnings line must have been false.

39

The government asserted that Brend had directed this "accounting effort," Dkt. 275 at 24, but no witness said so. The government asserted that Brend directed someone to create the Master Team spreadsheet for the use of IcomTech's attorney and that person "itemized the accounts and funds paid into the scheme for each account in Brend's downline." Dkt. 245 at 4. But in a footnote, the government clarified that "Brend was asking for accurate *accountings of losses* by his downlines" (*Id*. at 4, n. 3)(emphasis added), not an accounting of funds paid into the scheme. No explanation for why a lawyer would need an accounting of fraudulent losses was given.

The $4.9 million figure was not mentioned in the PSR, but the sentencing court relied on it and thought that since there were other conspirators who also had "teams," they might have also brought in a similar amount of money (A-164) so that might have amounted to more than $25 million. But this reasoning could not support the finding by a preponderance of evidence.

### e. The Forfeiture and Restitution Calculations

At the initial sentencing, the prosecutor was unsure and could not answer the court's questions as to the $4.792 million it sought in

40

forfeiture. When asked if the loss was being calculated during the period of the charged conspiracy, the prosecutor stated he would need to "dive into those spreadsheets again" to get "the particulars." A-149. But then later, the Court ordered $3.605 million in forfeiture– approximately $1.1 million less.  A-263.

The Mandatory Victims Restitution Act calls for an order of restitution for all actual losses incurred by the victims of a conspiracy. *United States v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000) (where a conspiracy has multiple victims, the MVRA allows the sentencing court to order restitution for all losses caused by the actions of a defendant as well as by the actions of his co-conspirators). Here, the government could show only about $789,000 in actual loss from the entire conspiracy.

The district court's finding of $58 million in actual loss was clearly erroneous. There is a long way from $3.6 million and the other conspirators were found to have received to the more than $25 million guideline. This Court would be justified in feeling uncomfortable considering the district court's findings as to loss.

41

**f. The Error Was Not Harmless**

In an apparent effort to avoid a successful appeal, the sentencing court said it would impose a 121-months sentence under 3553(a) regardless of Carmona's "issues with the loss amount and I take that into account." The court said that "even if the loss amount here was only between 3.5 million and 9.5 million, and it clearly was at least that based on Mr. Brend's spreadsheet, with at least 4.9 [million dollars] reflected in the other evidence here, that would mean that 18 points were added instead of 22, which would lead to an offense level range of 32 and a range of 121 to 151 months. I considered this and my sentence falls within that range." The court added that even if the guidelines range was 97 to 121 months or lower as requested by Mr. Carmona, it "would still vary upward and still impose the same 120-month sentence because of the factors that I have discussed, including the culpability of the defendant and the significant harm that he did to so many people and the significant need for deterrence and to protect the public. And frankly, the failure to take full responsibility for starting a fraud and continuing it to the end." A-227-228.

This Court will remand a case for re-sentencing when it "cannot

42

be confident that the district court would have imposed the same sentence if it had applied the correct guideline." *United States v. Brogdon*, No. 21-475-cr, 2022 U.S. App. LEXIS 3078, at *3 (2d Cir. Feb. 3, 2022) (summary order) quoting *United States v. Seabrook*, 968 F.3d 224, 232 (2d Cir. 2020). In the *Seabrook* case, the Court vacated a sentence as it was not "confident that the district court would have imposed the same sentence if it had applied the correct guideline." *Id.* The Court relied on controlling Supreme Court precedent.

> "A district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range." *Cavera*, 550 F.3d at 189. In light of "[t]he Guidelines' central role in sentencing," an error related to the Guidelines range "can be particularly serious." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345, 194 L. Ed. 2d 444 (2016). "A district court that improperly calculates a defendant's Guidelines range . . . has committed a significant procedural error." *Id.* at 1345-46 (internal quotation marks, brackets, and citation omitted).

*Id.* In 2018, the Supreme Court emphasized the importance of enforcing findings of procedural error. In *Rosales-Mireles v. United States*, 585 U.S. 129 (2018), the Court reaffirmed that "when a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error

43

itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Id.* at 139 quoting *Molina-Martinez*, 578 U.S. at 198. "In other words, an error resulting in a higher range than the Guidelines provide usually establishes a reasonable probability that a defendant will serve a prison sentence that is more than 'necessary' to fulfill the purposes of incarceration." *Id.* at 139.

Carmona's 121-month sentence was determined by reference to the incorrect, unreliable, and much higher guideline. The district court imposed a variance from the 188 to 235 month range, but if the range had been much lower, this Court cannot be confident that a lower sentence would not have been imposed. Carmona's culpability could have been addressed with a sentence below 120 months even in view of the victims' losses. A sentence of imprisonment of seven, eight or nine years would have provided for deterrence and protection of the public. Mr. Carmona will be deported to Mexico and banned from returning once he completes his sentence. The court's reference to what it said was his lack of taking responsibility was also wrong because he pleaded guilty and the Court found that he fully accepted responsibility as

recommended by the PSR and the government when it moved for the third-point reduction pursuant to U.S.S.G. § 3E1.1.

As in *United States v. Joyner*, No. 20-3305-cr, 2022 U.S. App. LEXIS 545 (2d Cir. Jan. 7, 2022) (summary order), the record does not clearly indicate that the district court would have imposed the same sentence absent the erroneous calculation. The court's reliance on what it said was Brend's $4.9 million calculation was wrong because there was no evidence that Brend made that calculation or that it accurately reflected his ill-gotten gains. As in *Seabrook*, it appears the court's error may well have anchored its thinking in framing its choice of the appropriate sentence so it is not "clear" that the miscalculation had "no influence on the sentence." 968 F.3d at 234.

Ochoa, who was found to have a fraud loss between $550,000 and $1,500,000 (a 14-level increase), received a sixty-month sentence for the same offense of conviction. Even accounting for Carmona's leadership, his sentence could be significantly higher than Ochoa's and still be less than 121 months' imprisonment.

The improper guideline calculation resulted in an actual, concrete, and not harmless procedural error.

45

## Conclusion

This sentence was determined based on an unfairly inflated sentencing guidelines range. The district court clearly erred in finding an actual loss greater than $25 million and decided to impose a more than ten year sentence as a result. The law compels the sentence be vacated and the matter remanded for re-sentencing with the proper –and lower– sentence guidelines range.

Dated:      February 26, 2025
           White Plains, New York

                   Respectfully,

                   /s/ Richard D. Willstatter
                   Richard D. Willstatter
                   *Attorney for David Carmona*
                   Green & Willstatter
                   200 Mamaroneck Avenue, Suite 605
                   White Plains, New York 10601
                   (914) 948-5656

**Certificate of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(g) and Local Rule 32.1(a)(4)(A) in that the brief contains 8,547 words according to the word-processing program used to prepare the brief. The brief complies with typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) in that the brief has been prepared in Century Schoolbook typeface in WordPerfect 21 in 14-point size.

Dated:      February 26, 2025
            White Plains, New York

                                    /s/ Richard D. Willstatter
                                    Richard D. Willstatter

47